UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| ANTON PHILLIPS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RIVERSIDE TRANSPORTATION, INC.,<br><br>Defendant. | Civil Action No. 2:23-cv-2440<br><br>**JURY DEMANDED.** |

**CLASS AND COLLECTIVE ACTION COMPLAINT**

I.   **INTRODUCTION.**

1. Plaintiff Anton Phillips brings this action individually and on behalf of all other similarly situated individuals who have worked as commercial truck drivers for Defendant Riverside Transportation, Inc. ("Riverside"). As described herein, Phillips alleges that Riverside has engaged in a pattern of conduct that violates state and federal law concerning the payment of wages and the treatment of commercial truck drivers.

2. Riverside failed to pay Phillips and other individuals who have worked for Riverside as "lease drivers" all the wages they were entitled to receive in violation of the Fair Labor Standards Act ("FLSA"). In addition, Riverside has violated 49 U.S.C. § 14101, *et seq.*, by failing to comply with the lease agreement, escrow, and "chargeback" provisions of the Federal Motor Carrier Safety Administration's ("FMCSA") Truth-in-Leasing regulations ("TIL regulations"), 49 C.F.R. § 376, *et seq.*

3. In this action, Phillips seeks: certification of an FLSA collective and a Rule 23 class of individuals who have worked for Riverside providing commercial truck driving services

1

and whom Riverside has classified as "independent contractors" during the relevant statutory periods; an order enjoining Riverside from further violations of the FLSA and TIL regulations; restitution for all unpaid wages, improper deductions, and damages sustained as a result of Riverside's TIL violations; liquidated damages; pre- and post-judgment interest; attorneys' fees and costs; and any other relief that this Court deems appropriate.

## II. JURISDICTION AND VENUE.

4. This Court has original jurisdiction in this matter under 28 U.S.C. § 1331 because it arises under the laws of the United States. Specifically, this action asserts claims under 29 U.S.C. § 201, *et seq.*, and 49 U.S.C. § 14101, *et seq.*

5. Venue is proper with this Court under 28 U.S.C. § 1391(a) and (d) because Riverside is subject to the personal jurisdiction of this Court due to its significant contacts with this District.

## III. THE PARTIES.

6. Anton Phillips is an adult resident of North Dakota. From December 2022 to June 2023, Phillips performed commercial truck driving services as a "lease driver" for Riverside Transportation, Inc.

7. With respect to his claim under the FLSA, Phillips brings this action individually and for all others similarly situated who may file their written consent to join this action pursuant to 29 U.S.C. § 216(b):

> All individuals who have performed commercial truck driving services for Riverside Transportation, Inc. as "lease drivers" and whom Riverside Transportation, Inc. has classified as independent contractors at any time during the three-year period preceding the filing of this Complaint.

8. With respect to his claims under 49 U.S.C. § 14101 and the TIL regulations, Phillips brings this action individually and on behalf of the following proposed Rule 23 class:

> All individuals who have performed commercial truck driving services as "lease drivers" for Riverside Transportation, Inc. subject to a written lease agreement at any time during the four-year period preceding the filing of this Complaint.

9. Riverside Transportation, Inc. is a corporation organized under the laws of the State of Indiana that is authorized by the United States Department of Transportation to operate as a motor carrier. It maintains offices and a terminal at 5400 Kansas Avenue in Kansas City, Kansas.

## IV. STATEMENT OF FACTS.

### a. Riverside's business structure and lease driver classification.

10. Riverside is in the business of providing commercial freight transportation services – i.e., transporting goods in interstate commerce – for customers using motor carrier vehicles.

11. Riverside is an "authorized carrier" within the meaning of the TIL regulations because it is authorized to engage in the property transportation as a motor carrier under 49 U.S.C. §§ 13901 and 13902.

12. Riverside retains numerous individuals to provide commercial truck driving services. For example, Riverside has stated in its filings with the FMCSA that it has employed more than 900 drivers between 2022 and 2023.

13. Riverside classifies the individuals who provide commercial truck driving services for it into three categories:

   a. "company drivers," who work for Riverside on an employee basis using vehicles supplied by Riverside;

      b.     "lease purchase drivers," (hereinafter "lease drivers") who work for Riverside on an "independent contractor" basis using vehicles leased from Riverside or one of its affiliated companies; and

      c.     "owner-operators," who work for Riverside on an "independent contractor" basis and who own their own vehicles.

14.     Riverside requires its lease drivers to execute a written contract called an "Independent Contractor Operating Agreement" ("Agreement"), a copy of which, executed by Phillips, is attached as **Exhibit 1**.

15.     Despite classifying its lease drivers as independent contractors, Riverside maintains the right to control and direct – and does, in fact, control and direct – the terms and details of the work performed by the lease drivers so that they are, as a matter of economic reality, Riverside's employees.

16.     For example, Riverside requires all new lease drivers to participate in a mandatory orientation program at one of its facilities. This orientation program lasts three to four days, between 7 and 8 hours per day.

17.     Riverside's orientation program is focused on training lease drivers on Riverside's policies, procedures, and systems, rather than general knowledge or information concerning commercial truck driving.

18.     Riverside maintains a system of progressive discipline for lease drivers. Under that system:

      a.     lease drivers who "(a) commit three (3) minor breaches, or (b) receive two (2) minor breach notices in any period of six (6) consecutive months" are subject to investigation by Riverside;

  b. lease drivers are not "eligible for dispatch" while subject to investigation for "minor breaches," meaning that Riverside will not assign them work during the period of the investigation; and

  c. Riverside retains the exclusive right to decide whether it will terminate any driver following its investigation and to terminate the Agreement with any driver "for cause," which is determination unilaterally made by Riverside.

19. Riverside maintains written "Policies and Procedures" for the lease drivers, including policies governing driver qualifications and a "Manual for Contractors and Their Drivers" which contain rules, guidance, and instructions lease drivers are expected to follow.

20. Riverside's Agreements make conclusory statements to further the fiction that Riverside's lease drivers are not employees of Riverside; however, numerous provisions in the Agreements clearly retain for Riverside pervasive operational and financial control over the lease drivers' work.

21. For example, Riverside's Agreements state that:

  a. drivers must keep Riverside's customer identities and "trade secrets, know how and information relating to Riverside's business, forms, processes, developments, sales and promotional systems, prices and operations … and other sources of any kind resulting from this Agreement" as confidential, with "material breaches" of this provision subject to legal action and termination;

  b. drivers must "adhere to [Riverside's] policies applicable to the carrying of passengers and pets" in their vehicles, which include (i) obtaining Riverside's prior approval before carrying pets in their vehicles' cabins and (ii) a prohibition on permitting

"any passenger to operate or be in charge of the [drivers' vehicles] at any time for any purpose whatsoever, or to be outside the cab during loading or unloading";

  c. Riverside may withhold any compensation owed to any driver unless and until the driver removes and returns Riverside's identification devices from their vehicle upon termination of the Agreement;

  d. Riverside may deduct or recover numerous charges from the drivers' compensation, none of which are subject to negotiation and all of which are unilaterally imposed by Riverside as an essential term of its Agreement;

  e. drivers must bear all costs, fees, and expenses incurred in connection with the ownership, use, operation, licensing, and maintenance of the trucks they use while performing commercial driving services for Riverside and Riverside's customers; and

  f. drivers cannot engage in "alternative use" of their vehicles (such as by trip leasing, i.e., transporting loads for another motor carrier under Riverside's operating authority) without Riverside's prior consent, which the drivers' failure to obtain constitutes a "material breach" and is grounds for termination.

22. Riverside maintains control and direction over the drivers' work as a practical matter as well. For example, Riverside employs driver managers and dispatchers whose primary responsibility is to assign work to the drivers, manage the drivers' schedules, and monitor the drivers' work.

23. Likewise, while Riverside informs lease drivers that they do not operate under a "forced dispatch" system, in actuality, Riverside's lease drivers operate under a *de facto* forced dispatch because:

      a.      Riverside's driver managers and dispatchers will not "award" work, or will award only low-paying work, to drivers who refuse or reject loads; and

      b.      the lease drivers must make monthly payments on their leased vehicles, which means they often have little choice but to accept work as directed by Riverside lest they default on their leases.

24.    Riverside's investment in its business far outstrips any investment the lease drivers have in their work or working conditions.

25.    Riverside operates facilities in three different states and, according to its website, owns more 800 tractors and 4,200 trailers and employs close to 1,100 people.

26.    By comparison, the lease drivers' investment in their work is limited to the costs associated with their lease arrangements.

27.    Indeed, Riverside advertises that its "lease purchase program" requires "no money down, no credit check" and is fully "walkaway" so that drivers can "leave at any time."

28.    The lease drivers also perform a service that is entirely within the usual course of Riverside's business.

29.    Specifically, the lease drivers perform commercial truck driving services delivering freight for Riverside, which is a commercial freight transportation company.

30.    The lease drivers are an integral part of Riverside's business because without drivers, Riverside would be unable to provide commercial trucking services to customers.

31.    Riverside's drivers do not work in a genuinely independent trade, occupation, profession, or business as commercial truck drivers because, *inter alia*, Riverside:

      a.      recruits and hires individuals with little experience as drivers, whom Riverside holds out to customers as Riverside's drivers;

  b. brands the trailers transported by the drivers with Riverside's name and logo; and

  c. maintains exclusive access to the customers and clients, the revenue from whom Riverside uses to pay the drivers.

**b. Riverside's pay practices.**

32. Riverside pays its lease drivers on a per-mile basis; Riverside paid Phillips, for example, $1.12 per mile driven for Riverside, loaded or unloaded.

33. Riverside does not pay its lease drivers for their work "free and clear." Instead, Riverside takes numerous deductions from the drivers' compensation each pay period. These include deductions for:

  a. insurance;

  b. fuel, oil, and diesel costs;

  c. administrative "mark up" fees imposed by Riverside;

  d. maintenance and repairs;

  e. tolls;

  f. permits;

  g. data usage;

  h. uniforms;

  i. truck washes;

  j. permits; and

  k. routine operating expenses.

34. The deductions taken by Riverside are not required by law, nor are they for the benefit of the drivers.

35. As a result of these deductions, lease drivers have worked for Riverside without receiving at least the FLSA minimum wage of $7.25 per hour for all hours worked. For example:

    a. during the period between May 31, 2023, and June 12, 2023, Phillips drove a total of about 1,035 miles for Riverside and nominally earned $1,552.60 in gross compensation; however, he ultimately received no compensation for that work because Riverside took $1,841.91 in deductions from his pay, resulting in a negative balance of -$289.31; and

    b. likewise, during the period between March 29, 2023, and April 3, 2023, Phillips drove a total of about 701 miles for Riverside and nominally earned $1,830.09 in gross compensation for that work; however, Riverside took deductions totaling $1,984.91 from that compensation, leaving Phillips with a negative balance of -$154.82.

**c.  The TIL Regulations.**

36. The United States Secretary of Transportation has authority to regulate motor carriers engaged in interstate commerce. Pursuant to that authority, in 1979, the Secretary's Interstate Commerce Commission – now the FMCSA – adopted the TIL regulations.

37. The TIL regulations require, *inter alia*, that lease agreements be in writing and include certain terms with respect to driver compensation, management of escrow funds, disclosure of deductions or "chargebacks," and liability for vehicle usage.

38. The purpose of the TIL regulations is to encourage maximal disclosure by carrier to drivers concerning the obligations and benefits of a commercial leasing relationship in order to prevent carriers from taking advantage of drivers' weaker bargaining position.

39. The Agreement used by Riverside in connection with its lease drivers constitutes a "lease" within the meaning of the TIL regulations because it is a:

> contract … in which the owner grants the use of equipment, with or without driver, for a specified period to an authorized carrier for use in the regulated transportation of property, in exchange for compensation.

49 C.F.R. § 376.2; *see* Agreement, **Ex. 1** at §§ 1, 3.

40. Riverside is a "lessee" within the meaning of the TIL regulations because it acquires the use of equipment (i.e., commercial motor vehicles) from another (i.e., drivers who either lease or own their commercial motor vehicles).

41. The lease drivers who work for Riverside, including Phillips, are "lessors" within the meaning of the TIL regulations because they grant the use of equipment (i.e., commercial motor vehicles), with or without drivers, to another (i.e., Riverside).

### i. Improperly disclosed or specified chargebacks.

42. The TIL regulations mandate that motor carriers clearly disclose what items may be deducted from, or "charged back" to, drivers' compensation, including either the dollar amount of those deductions or how such deductions are calculated.

43. Riverside's Agreements do not clearly specify the amounts or method of calculating the chargebacks Riverside may deduct from drivers' compensation. For example, Riverside's Agreements state that it may "deduct or recover":

   a. the "amount" of items such as loss of or damage to electronic logging devices, vehicle maintenance or repairs, and medical exams based on what Riverside purportedly paid to undisclosed "third-party" vendors;

   b. "equipment lease charges" and "short-term tractor rental" by reference to unspecified addenda that are not part of the Agreements, e.g., the "Addendum to Equipment Lease Charge" and "Addendum to Short-Term Tractor Rental";

10

  c. for "catchall" operating costs that are either "paid" or "otherwise incurred" by Riverside, without further explanation or calculation as to how such sums would be determined.

44. Riverside has taken deductions from drivers' compensation that are not disclosed or clearly specified in the Agreements. For example:

  a. Riverside deducted a total of $585.33 from Phillips' compensation for the following items, none of which were clearly specified in his Agreement:

| Date | Description | Type | Qty | Rate | Amount | Status |
|---|---|---|---|---|---|---|
| 12/08/22 | 1/2 Orient 90869 01569 0160 ML | Express Check Manual | 1.00 | 250.0000 | 250.00 | Closed |
| 12/08/22 | 2/2 Orient 90869 01570 8911 ML | Express Check Manual | 1.00 | 250.0000 | 250.00 | Closed |
| 04/05/23 | Express Check\|\| 45006 69911 (Plus Fee) | Express Check | 1.00 | 23.7600 | 23.76 | Closed |
| 04/07/23 | load straps \| 45006 69942 (Plus Fee) | Express Check | 1.00 | 61.5700 | 61.57 | Closed |

  b. Riverside deducted a total of about $471 from Phillips' compensation for a "Long Term Driver Advance" which was not clearly specified in his Agreement:

| Date | Description | Type | Qty | Rate | Amount | Status |
|---|---|---|---|---|---|---|
| 03/06/23 | OTR-00189410 @$250/WK | Long Term Driver Advance | 1.00 | 250.0000 | 250.00 | Closed |
| 03/13/23 | OTR-00189410 @$250/WK | Long Term Driver Advance | 1.00 | 221.1100 | 221.11 | Closed |

  c. Riverside deducted $737 on approximately 26 occasions from Phillips' compensation for "FIX Truck Payment," which is neither disclosed nor described in his Agreement:

| Date | Description | Type | Qty | Rate | Amount | Status |
|---|---|---|---|---|---|---|
| 03/20/23 | 82193 FIX01 Truck Payment | FIX Truck Payment | 1.00 | 737.0000 | 737.00 | Closed |

  **ii.** **Improper management of driver escrow funds.**

45. The TIL regulations permit carriers to require drivers to pay money into an escrow account provided that several requirements are met. These requirement include, *inter alia*, that:

11

    a.  the parties' lease agreement identifies the "specific items to which the escrow fund can be applied" and that the carrier "pay interest on the escrow fund on at least a quarterly basis";

    b.  motor carriers "provide an accounting … of any transactions involving [the escrow] fund" by "clearly indicating in individual settlement sheets the amount and description of any deduction or addition made to the escrow fund" or by "providing a separate account … of any transactions involving the escrow fund"; and that,

    c.  motor carriers provide a "final accounting" of all deductions made to the escrow fund at the time of drivers' termination and that they return drivers' escrow funds no later than 45 days from the date of termination.

49 C.F.R. § 376.12(k).

46. Riverside requires drivers to pay $750 into an escrow "for the purpose of ensuring [their] compliance with [the lease agreement]." In order to fund this escrow, Riverside deducts $75 from each of the drivers' settlement statements until this $750 threshold is reached.

47. Riverside deducted $75 from each of Phillips' settlement statements until he had achieved the $750 required by Riverside's Agreement.

48. Riverside did not return the $750 escrow to Phillips within 45 days of his termination.

49. Riverside did not provide Phillips with a final accounting of the deductions made from his escrow fund; his final settlement statement from Riverside makes no reference to the status of his escrow fund.

50. During Phillips' term of service with Riverside, Riverside did not provide him with regular accountings of transactions involving his $750 escrow fund.

51.  Riverside also did not pay interest on Phillips' escrow fund on a quarterly basis.

52.  Riverside requires drivers to fund, through compensation deductions, a "general reserve," the terms of which Riverside fails to disclose in the drivers' lease agreements.

53.  The "general reserve" fund collected by Riverside qualifies as an "escrow fund" under the TIL regulations because it is:

> Money deposited by the lessor [i.e., the driver] … to guarantee performance, to repay advances, to cover repair expenses, to handle claims, to handle license and State permit costs, and for any other purposes mutually agreed upon by the lessor and lessee.

49 C.F.R. § 376.2.

54.  Riverside denotes deductions taken for the general reserve fund as "VAR Surety Reserve" on the drivers' settlement statements, as follows:

| 01/16/23 General Reserve | VAR Surety Reserve | 1.00 | 250.0000 | 250.00 | Closed |
|---|---|---|---|---|---|

55.  Riverside made deductions of $250 from each of Phillips' settlement statements for the "general reserve" fund until he reached the total sum of $3,000.

56.  Riverside never provided Phillips with an accounting of the transactions relating to the general reserve fund, did not specify what items may be deducted from that fund in the Agreement, and did not pay interest on that fund.

57.  Riverside failed to return the $3,000 it deducted from Phillips' compensation for the "general reserve" fund to Phillips within 45 days of his termination.

V.  **CLASS AND COLLECTIVE ALLEGATIONS.**

   A.  **The FLSA collective.**

58.  With respect to his claims under the FLSA, Phillips brings this action on a collective basis pursuant to 29 U.S.C. § 216(b). He seeks to represent the following collective (the "FLSA Collective") as to that claim:

>all individuals who have performed commercial truck driving services for Riverside Transportation, Inc., as "lease drivers" subject to a written agreement, whom Riverside Transportation, Inc., has classified as independent contractors at any time during the three-year period preceding the filing of this Complaint, and who file a written consent to join this action pursuant to 29 U.S.C. § 216(b).

59. The proposed FLSA Collective meets the requirements for certification under 29 U.S.C. § 216(b) because the members of that Collective performed the same job duties, for the same defendant, subject to the same policies concerning work hours and compensation. Accordingly, the members of the proposed FLSA Collective are similarly situated with respect to their relationship with Riverside.

60. Phillips has filed a written consent-to-sue form with this Complaint as **Exhibit 2**.

**B.     The Rule 23 class.**

61. With respect to his claim under the TIL regulations, Hammonds brings this action as a class action pursuant to Federal Rule of Civil Procedure 23. He seeks to represent the following class (the "TIL Class") as to that claim:

>all individuals who have performed commercial truck driving services as "lease drivers" for Riverside Transportation, Inc., subject to a written lease agreement at any time during the four-year period preceding the filing of this Complaint.

62. The TIL Class meets all the prerequisites and requirements for certification under Rule 23.

63. Membership in the TIL Class may be ascertained using objective legal and factual criteria and by using Riverside's own records, which would identify the individuals who would qualify as members of the proposed class.

64. The members of the TIL Class are too numerous for practicable joinder due to the size, composition, and geographic dispersion of the proposed class.

65. Phillips does not know the exact size of the class since that information is within the control of Riverside; however, on information and belief, the proposed class is estimated to consist of several hundred individuals.

66. There are questions of law and fact common to the proposed class that predominate over any individual issues that might exist. Common questions of law and fact include, *inter alia*, whether Riverside has:

    a. misclassified its lease drivers as independent contractors;

    b. failed to pay its lease drivers at least the federal minimum wage for all hours worked; and

    c. failed to adhere to the TIL regulations' requirements concerning lease agreements, escrow funds, and chargebacks.

67. The claims asserted by Phillips are typical of the claims of proposed class members because he performed the same work, subject to the same challenged practices, as the proposed class members he seeks to represent.

68. Phillips and his counsel will fairly and adequately protect and represent the interests of the class. Phillips has no conflict of interest with the proposed class members. His success in this matter will translate into success for the class generally. Phillips also retained the undersigned counsel, who are highly experienced in class litigation concerning truck drivers' wage and TIL rights.

69. A class action is an appropriate method for the fair and efficient adjudication of this controversy. The alternative – numerous lawsuits alleging similar or identical causes of action – would not serve judicial economy, while the prosecution of separate actions by the individual class members would create a risk of inconsistent adjudications that would establish

incompatible standards of conduct for Riverside. Moreover, some proposed class members – particularly current drivers – may be reluctant to bring their claims individually for fear of retaliation.

70. Public policy supports the broad remedial purposes of class actions in general and specifically to vindicate the rights afforded by the TIL regulations both to truck drivers, whose individual claims may be too small to warrant the time, commitment, and expense of litigation.

71. The proposed class will not be difficult to manage due to the uniformity of claims among the class members, the amenability of wage cases to class litigation, and the use of representative testimony and representative documentary evidence that will be similar or identical among the members of the proposed class.

## COUNT I
**Fair Labor Standards Act**
**29 U.S.C. § 201,** *et seq.*

72. On behalf of himself and the proposed collective, Phillips reasserts and incorporates here by reference all previous paragraphs in this Complaint.

73. As set forth herein, Riverside has violated the minimum wage provision of the FLSA, 29 U.S.C. § 206, by failing to pay the drivers, including Phillips, at least $7.25 per hour for all hours worked.

74. Phillips brings this claim on behalf of himself and all others similarly situated pursuant to 29 U.S.C. § 216(b).

## COUNT II
**Truth-in-Leasing Regulations**
**49 U.S.C. § 14101,** *et seq.***, and 49 C.F.R. § 376,** *et seq.*

75. On behalf of himself and the proposed class, Phillips reasserts and incorporates here by reference all previous paragraphs in this Complaint.

76. As set forth herein, Riverside has violated the TIL regulations, 49 C.F.R. § 376.11 & 376.12, by taking chargebacks and deductions from the lease drivers' compensation without providing the necessary disclosures in the drivers' lease agreements and by failing to properly manage the lease drivers' escrow funds, including paying interest on those funds, and returning those funds to drivers within 45 days of their termination.

77. As a result of Riverside's conduct with respect to its lease drivers, Phillips and Riverside's lease drivers have sustained damages in the form of, *inter alia*, improper chargebacks from their compensation; loss of interest payments on escrow funds; and forfeiture of funds held in escrow for reasons that are improper under the TIL regulations.

78. Phillips brings this claim on behalf of himself and all others similarly situated pursuant to 49 U.S.C. § 14704 and Federal Rule of Civil Procedure 23.

## **PRAYER FOR RELIEF**

79. Plaintiff hereby demands a jury on all claims.

80. Plaintiff respectfully requests that the Court grant the following relief:

    a. Certification of the proposed collective and class;

    b. Appointment of Phillips and the undersigned counsel as representatives of the certified collective and class;

    c. An order enjoining Riverside from further violations of the FLSA and the TIL regulations;

    d. Restitution of all unpaid minimum wages owed under the FLSA;

    e. Restitution of all damages sustained as a result of Riverside's TIL violations;

    f. Liquidated damages and penalties as provided for in 29 U.S.C. § 216(b);

      g.      Pre- and post-judgment interest;

      h.      Attorneys' fees and costs; and

      i.      Any such other relief that this Court deems appropriate.

Respectfully submitted,
ANTON PHILLIPS, individually and on behalf of all others similarly situated,

By their attorneys,


*/s/ Brendan J. Donelon*
Brendan J. Donelon, KS #17420
DONELON, P.C.
4600 Madison, Ste. 810
Kansas City, Missouri 64112
816-221-7100
Fax: 816-709-1044
brendan@donelonpc.con

Hillary Schwab, Mass. BBO #666029*
Brant Casavant, Mass. BBO #672614*
Rachel Smit, Mass. BBO #688294*
FAIR WORK P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3260
hillary@fairworklaw.com
brant@fairworklaw.com
rachel@fairworklaw.com

*\* Applications for admission pro hac vice forthcoming.*

Dated:  September 28, 2023.